## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **MELODY M. COOPER,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:18cv00033 |
| | ) | **REPORT AND** |
| **ANDREW SAUL,**[1] | ) | **RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | By:   PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Melody M. Cooper, ("Cooper"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 *et seq.* (West 2011 & Supp. 2019). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). Neither party has requested oral argument. This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019; therefore, he is substituted for Nancy A. Berryhill as the defendant in this case.

be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Cooper protectively filed her application for DIB on June 30, 2014, alleging disability as of February 27, 2014, based on lower back problems, left leg pain, arthritis, depression and low blood sugar. (Record, ("R."), at 15, 230-31, 251.) The claim was denied initially and upon reconsideration. (R. at 132-34, 138-40, 143-47, 149-51.) Cooper then requested a hearing before an administrative law judge, ("ALJ"). (R. at 152-53.) The ALJ held a hearing on March 23, 2017, at which Cooper was represented by counsel. (R. at 35-88.)

By decision dated May 26, 2017, the ALJ denied Cooper's claim. (R. at 15-29.) The ALJ found that Cooper met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2019. (R. at 17.) The ALJ found that Cooper had not engaged in substantial gainful activity since February 27, 2014, the alleged onset date.[2] (R. at 17.) The ALJ found that Cooper had severe impairments, namely degenerative disc disease and osteoarthritis, but he found that Cooper did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17, 20.) The ALJ found that Cooper had the residual functional capacity to perform light work[3] that required no more than occasional climbing of

---

[2] Therefore, Cooper must show that she was disabled between February 27, 2014, the alleged onset date, and May 26, 2017, the date of the ALJ's decision, in order to be eligible for benefits.

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2018).

ladders, ropes or scaffolds and that required no more than occasional exposure to unprotected heights, moving mechanical parts and vibration. (R. at 20-21.) The ALJ found that Cooper was able to perform her past relevant work as a retail district manager. (R. at 28.) Thus, the ALJ concluded that Cooper was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 29.) *See* 20 C.F.R. § 404.1520(f) (2018).

After the ALJ issued his decision, Cooper pursued her administrative appeals, (R. at 227, 315-18), but the Appeals Council denied her request for review. (R. at 1-5.) Cooper then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2018). This case is before this court on Cooper's motion for summary judgment filed March 5, 2019, and the Commissioner's motion for summary judgment filed March 21, 2019.

## *II. Facts*

Cooper was born in 1965, (R. at 230), which, at the time of the ALJ's decision, classified her as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). Cooper has a high-school education and past work experience as a district manager in retail. (R. at 40-41, 44, 252.) Cooper stated that she used a cane and a back brace "all of the time," both of which had been prescribed.[4] (R. at 57-58, 62.) She stated that her symptoms of anxiety and depression were "somewhat" controlled with medication. (R. at 65-66.) Cooper stated that she did not go anywhere or do anything because she did not want to be

---

[4] There is no evidence contained in the record to show that a cane and back brace were prescribed for Cooper.

around people. (R. at 67.) She stated that her anxiety was so severe at times that she believed she was having a heart attack. (R. at 68-69.)

John Newman, a vocational expert, also was present and testified at Cooper's hearing. (R. at 76-86.) Newman classified Cooper's past work as a retail manager as light and skilled. (R. at 77.) He stated that Cooper's work, as she performed it, however, was classified as medium[5] and unskilled.[6] (R. at 77.) He stated that Cooper had no transferable skills to the sedentary[7] level. (R. at 78.) Newman was asked to consider a hypothetical individual of Cooper's age, education and work history, who could perform light work that did not require more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; that did not require climbing of ladders, ropes or scaffolds; and that did not require more than occasional exposure to unprotected heights, moving mechanical parts and vibration. (R. at 78.) Newman testified that such an individual could perform Cooper's past work as a retail manager and district manager, as generally performed. (R. at 79.) He also stated that other work existed in significant numbers in the national economy that such an individual could perform, including jobs as a cashier, a mail clerk and a sales attendant. (R. at 79-80.) Newman next was asked to consider the same individual, but who would

---

[5] Medium work involves lifting items weighing up to 50 pounds at a time and frequently lifting and carrying items weighing up to 25 pounds. If someone can do medium work, she also can do light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2018).

[6] Newman indicated that Cooper's work, as she performed it, also would be classified as a stock clerk or store laborer. (R. at 77.) Therefore, in the aggregate, her work as a retail store manager, individual store manger and district manager or area supervisor would be classified as medium and skilled. (R. at 77.)

[7] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2018).

be limited to performing simple, routine tasks and simple work-related decisions and who could frequently respond appropriately to co-workers and the public. (R. at 81.) He stated that the individual could not perform Cooper's past work, but that the individual could perform the previously identified jobs. (R. at 81.)

Next, Newman was asked to consider hypothetical individual number two, but who would be able to occasionally lift and carry items weighing up to 10 pounds, but less than 10 pounds frequently; to stand and/or walk for only two hours in an eight-hour workday; who could operate hand controls with her right hand occasionally and with her left hand frequently; who could frequently reach overhead and handle items with the left hand; and who could occasionally handle items with the right hand. (R. at 81-82.) Newman testified that this individual would be limited to sedentary, unskilled work, which required good use of both hands. (R. at 82.) Therefore, there would be no jobs available that such an individual could perform. (R. at 82.) Newman also stated that there would be no jobs available should the individual be off task greater than 10 percent of the workday. (R. at 83.)

In rendering his decision, the ALJ reviewed records from Wise County Public Schools; Dr. Michael Cole, M.D., a state agency physician; Dr. Richard Surrusco, M.D., a state agency physician; Wellmont-Mountainview Regional Medical Center, ("Mountainview"); Lonesome Pine Hospital, ("Lonesome Pine"); Dr. G. S. Kanwal, M.D.; Coeburn Hospital Clinic, Inc., ("Coeburn Clinic"); Norton Community Hospital; Simpson Clinic, LLC; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; and Frontier Health.

On October 30, 2009, Cooper saw Dr. G. S. Kanwal, M.D., for complaints of low back pain. (R. at 512.) She requested that her prescription for Lortab be

increased. (R. at 512.) On February 22, 2010, Cooper reported that she was doing well. (R. at 510.) On August 20, 2010, Cooper complained of back and bilateral arm pain. (R. at 508.) On November 19, 2010, Cooper complained of "nerves." (R. at 507.) Dr. Kanwal diagnosed depression, back pain and low back syndrome. (R. at 507.) On November 30, 2010, Dr. Kanwal noted that, Cooper "demands Xanax by name" and stated that she would change medical care providers to get it. (R. at 506.) On January 10, 2011, it was noted that Cooper was "pushing for Xanax." (R. at 506.)

On April 27, 2012, Cooper presented to the emergency room at Mountainview for complaints of back pain. (R. at 320-22.) An MRI of Cooper's lumbar spine showed a small broad-based disc protrusion at the L5-S1 disc level with no neural compromise. (R. at 321.) She was diagnosed with lumbago. (R. at 320.)

Throughout 2013, Cooper complained of multiple joint pain; hypertension; hypoglycemia; anxiety; low back pain that radiated into her legs; left hip pain; and migraine headaches. (R. at 380-83, 386, 390.) During this time, Dr. Kanwal repeatedly reported that Cooper's musculoskeletal system revealed multiple joint tenderness and decreased range of motion; her neurological examinations were normal; and she had no symptoms of anxiety or depression. (R. at 379-83, 386-89, 392, 486.) Cooper reported that she had no symptoms of anxiety and depression, and Dr. Kanwal noted that Cooper's anxiety and depression were stable. (R. at 379-83.) In September 2013, Cooper reported that she received pain relief with injections. (R. at 382.) In October 2013, Cooper reported that, despite being in pain, she was still active. (R. at 381.) In December 2013, Cooper reported that medication relieved her pain. (R. at 379.)

Throughout 2014, Cooper complained of back pain that radiated into her legs; knee pain; right shoulder pain; pain in her hands and fingers; anxiety; and depression. (R. at 370-71, 373-78.) During this time, Dr. Kanwal repeatedly reported that Cooper's musculoskeletal system revealed multiple joint tenderness and decreased range of motion; her neurological examinations were normal; and she had no symptoms of anxiety or depression. (R. at 371, 373-78, 410-11, 413.) Cooper attributed her depression and anxiety to chronic pain. (R. at 371, 373, 413.) On several occasions, Cooper reported that she had no symptoms of anxiety and depression, and Dr. Kanwal noted that Cooper's anxiety and depression were stable. (R. at 371, 373-78, 410.)

On August 13, 2014, examination of Cooper's musculoskeletal system revealed multiple site tenderness and decreased range of motion; her neurological examination was normal; and she had no anxiety or depression, as her symptoms were stable on medication. (R. at 371.) Following his examination, Dr. Kanwal completed a mental assessment, indicating that Cooper had a satisfactory ability to use judgment; to deal with work stresses; to maintain attention and concentration; to understand, remember and carry out complex job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 362-64.) He opined that Cooper had a seriously limited ability to follow work rules; to relate to co-workers; to deal with the public; to interact with supervisors; to function independently; to understand, remember and carry out detailed and simple job instructions; and to maintain personal appearance. (R. at 362-63.) Dr. Kanwal opined that Cooper would be absent from work about one day a month due to her impairments. (R. at 364.)

That same day, Dr. Kanwal completed a medical assessment, indicating that Cooper could occasionally lift and carry items weighing up to 20 pounds and

frequently lift and carry items weighing up to 10 pounds; she could stand and/or walk up to one hour in an eight-hour workday and could do so for 15 to 30 minutes without interruption; she could sit up to four hours in an eight-hour workday and could do so for up to one hour without interruption; she could never climb, stoop, kneel, balance, crouch or crawl; she was limited in her ability to reach, to handle and to push and pull; and she was restricted from working around heights, moving machinery, noise, humidity and vibration. (R. at 366-68.) Dr. Kanwal opined that Cooper was unable to work. (R. at 368.) He stated that, "if [Cooper] get[s] a job that is sedentary[,] she still will miss 2 or more days [of] work." (R. at 368.)

On September 11, 2014, Cooper reported that her chronic back pain and knee pain was relieved by medication. (R. at 412.) On October 9, 2014, Cooper reported that she was "ok" and "stable." (R. at 411.)

On January 12, 2015, Cooper saw Dr. Harland Simpson, M.D., for complaints of low back pain. (R. at 430.) Cooper stated that she was applying for disability. (R. at 430.) Cooper stated that she had decreased function and that her quality of life had decreased due to pain. (R. at 430.) Examination revealed tenderness on palpation, intact sensation and negative straight leg raising tests. (R. at 431.) Dr. Simpson reported that, although Cooper was distressed, she was groomed, clean, alert and oriented and answered questions appropriately. (R. at 431.) Cooper reported that she walked weekly and performed easy housework. (R. at 432.) Dr. Simpson diagnosed hypertension, herniated nucleus pulposus at the L-5 level and lumbar radiculopathy. (R. at 431.)

On January 18, 2015, Dr. D. Kevin Blackwell, D.O., examined Cooper at the request of Disability Determination Services. (R. at 422-26.) Dr. Blackwell reported that Cooper was alert and cooperative with good mental status, and her

affect, thought content and general fund of knowledge appeared intact. (R. at 424.) Examination revealed lumbar musculature tenderness; bilateral knee tenderness; symmetrical and balanced gait; shoulder and iliac crest heights were good and equal bilaterally; no effusions or obvious deformities in the upper and lower joints; normal size, shape, symmetry and strength in the upper and lower extremities; full and equal grip strength bilaterally; normal fine motor movement and skill activities of the hands; good and equal reflexes in the upper and lower extremities; and intact sensation. (R. at 425.) X-rays of Cooper's lumbar spine performed on January 8, 2015, were normal. (R. at 418.) Dr. Blackwell diagnosed bilateral knee pain; chronic low back pain; history of hypertension; hypoglycemia; and history of depression. (R. at 425.)

Dr. Blackwell opined that Cooper could sit up to eight hours in an eight-hour workday and stand up to two hours in an eight-hour workday, assuming normal positional changes; perform bilateral above-head reaching and kneeling up to one-third of an eight-hour workday; no repetitive and continuous stair climbing or squatting; and she could occasionally lift items weighing up to 30 pounds and frequently lift items weighing up to 15 pounds. (R. at 425-26.) No visual, communicative, hearing or environmental limitations were noted. (R. at 425-26.) No limitations on Cooper's hand usage, including fine motor movement and skill activities of the hands, were noted. (R. at 426.)

On February 2, 2015, Dr. Michael Cole, M.D., a state agency physician, completed a medical assessment, finding that Cooper could perform light work. (R. at 108-09.) He found that Cooper could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 108-09.) No manipulative, visual or communicative limitations were noted. (R. at 109.) Dr. Cole opined that Cooper should avoid

concentrated exposure to extreme cold and moderate exposure to hazards, such as machinery and heights. (R. at 109.)

On February 4, 2015, Dr. Simpson saw Cooper for complaints of pain and difficulty sleeping. (R. at 428-29.) Cooper stated that she had minimal pain relief and she had difficulty with her activities of daily living due to pain. (R. at 428.) Dr. Simpson reported that Cooper walked with a limp, she had left spine rigidity and tenderness on palpation of the lumbar spine with spasm. (R. at 428.) On March 4, 2015, Cooper reported minimal pain relief, but Mobic provided some relief. (R. at 440.) She reported that she did some floor exercises, but stated that she was unable to mop or sweep. (R. at 440.) Cooper reported that her sleep had improved. (R. at 440.) Dr. Simpson reported that Cooper had tenderness on palpation and lumbar paraspinous spasm. (R. at 440.)

On March 24, 2015, Dr. Richard Surrusco, M.D., a state agency physician, completed a medical assessment, finding that Cooper could perform light work. (R. at 122-23.) He found that Cooper could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl and never climb ladders, ropes and scaffolds. (R. at 122.) No manipulative, visual or communicative limitations were noted. (R. at 123.) Dr. Surrusco opined that Cooper should avoid concentrated exposure to vibration and to hazards, such as machinery and heights. (R. at 123.)

On April 21, 2015, Dr. Kanwal reported that Cooper's musculoskeletal system revealed multiple joint tenderness and decreased range of motion; her neurological examination was normal; and she displayed no symptoms of anxiety or depression. (R. at 499.)

On May 13, 2015, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Cooper at the request of Cooper's attorney. (R. at 461-68.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Cooper obtained a full-scale IQ score of 73. (R. at 462.) Cooper's speech was clear and intelligible; she was able to recall four out of five words; she correctly performed Serial 7s; she gave high order and correct interpretation to three out of three commonly used adages; and she correctly spelled the word "world" both forwards and backwards. (R. at 464-65.) Lanthorn diagnosed major depressive disorder, recurrent, severe; and generalized anxiety disorder. (R. at 467.) Lanthorn "strongly encouraged" Cooper to seek mental health services in the form of both psychiatric and psychotherapeutic intervention. (R. at 468.)

On June 2, 2015, Lanthorn completed a mental assessment, indicating that Cooper had mild limitations in her ability to understand, remember and carry out simple job instructions. (R. at 470-72.) He opined that Cooper had a satisfactory ability to follow work rules; to function independently; to maintain attention and concentration; to understand, remember and carry out detailed job instructions; and to maintain personal appearance. (R. at 470-71.) Lanthorn opined that Cooper had a seriously limited ability to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to deal with work stresses; to understand, remember and carry out complex job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 470-71.) He opined that Cooper would be absent from work more than two days a month. (R. at 472.)

For the remainder of 2015, examination of Cooper's musculoskeletal system showed multiple site tenderness and decreased range of motion; her neurological

examination was normal; and she displayed no symptoms of anxiety or depression. (R. at 372, 607.) During this time, Cooper related her anxiety and depression to her pain. (R. at 372.)

Throughout 2016, Cooper complained of low back pain; bilateral shoulder pain; migraine headaches; high blood pressure; depression; left leg pain; and numbness in her right fingers. (R. at 589-92, 595, 597, 600.) During this time, Cooper reported that medication helped her pain. (R. at 593, 598.) In addition, Dr. Kanwal reported that examination of Cooper's musculoskeletal system revealed multiple site tenderness and decreased range of motion; deep tendon reflexes of the upper and lower extremities were symmetrical and graded at 2/4; cerebellar function was normal; gait and sensation were normal; she was alert and oriented; her speech was fluent and clear; she had coherent thought processes and good insight; she had no obsessive, compulsive, phobic or delusional thoughts; she correctly performed Serial 7s; her recent and remote memory were intact; her fund of knowledge, awareness of current events and past history was appropriate; her higher cognitive functions were intact; she could perform simple calculations and understand proverbs; her mood was neutral; and her affect was appropriate. (R. at 593-94, 598-99.) In April 2016, Dr. Kanwal noted that Cooper had a "severe anxiety state," but by December 2016, Cooper displayed no anxiety or depressive symptoms. (R. at 589-90.) Dr. Kanwal diagnosed low back pain; chronic pain syndrome; chronic migraine without aura, not intractable; hypertension; and major depressive disorder, single episode, unspecified. (R. at 596, 599, 601.)

On July 25, 2016, Cooper was assessed at Frontier Health for continued therapy due to symptoms related to situational stressors. (R. at 586.)

On December 1, 2016, Dr. Kanwal completed a medical assessment, indicating that Cooper could not lift and carry items of any weight; she could stand and/or walk up to two hours in an eight-hour workday and could do so for up to 30 minutes without interruption; she could sit up to three hours in an eight-hour workday and could do so for up to 30 minutes without interruption; she could never climb, stoop, kneel, balance, crouch or crawl; she was limited in her ability to reach, to handle, to feel and to push and pull; and she was restricted from working around heights, moving machinery, temperature extremes, chemicals, noise, fumes and vibration. (R. at 534-36.) Dr. Kanwal opined that Cooper would be absent from work more than two days a month. (R. at 536.)

On January 3, 2017, Cooper was seen at Frontier Health for complaints of depression. (R. at 580-84.) She related her symptoms of depression to physical problems, such as arthritis and bone disease. (R. at 580.) Cooper stated that she received mental health therapy services in 2016, which assisted with a decrease in her depressive symptoms. (R. at 580.) Cooper was diagnosed with major depressive disorder, recurrent episode, severe; generalized anxiety disorder; and post-traumatic stress disorder. (R. at 562.)

On January 26, 2017, Cooper complained of bilateral shoulder pain and low back pain. (R. at 588.) Dr. Kanwal noted tenderness in Cooper's back that radiated into her left leg. (R. at 588.) He reported that Cooper did not have symptoms of anxiety or depression. (R. at 588.) On February 14, 2017, Cooper reported panic attacks. (R. at 609.) Cooper was oriented; her speech was clear and logical; her mood was dysphoric; her affect was congruent; she was tearful during the session; she made limited eye contact; she was dressed appropriately; and she did not display any psychosis. (R. at 609.) On March 13, 2017, Cooper reported that she did not like to be around people and found it difficult to go into public places. (R.

at 614.) Cooper was oriented; her speech was clear and logical; her mood was dysphoric; her affect was congruent; she was tearful during the session; she made limited eye contact; and she did not display any suicidal or homicidal ideations. (R. at 614.) On March 16, 2017, Cooper complained of low back and bilateral shoulder pain. (R. at 616.) Examination of Cooper's musculoskeletal system was normal; her neurological examination was normal; and she displayed no symptoms of anxiety or depression. (R. at 616.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2018). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2018).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2011 & Supp.

2019); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Cooper argues that the ALJ erred by failing to find that she suffered from a severe mental impairment. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-6.) Cooper also argues that the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Brief at 6-8.) In particular, Cooper argues that the ALJ erred by not relying on the opinions of Lanthorn and Drs. Kanwal and Blackwell. (Plaintiff's Brief at 6-8.)

Cooper argues that the ALJ erred by failing to find that she suffered from a severe mental impairment. (Plaintiff's Brief at 5-6.) The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1522(a) (2018). Basic work-related mental activities include understanding, remembering and carrying out simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. §

-15-

404.1522(b). Although the Social Security regulations do not define the term "significant," this court previously has held that it must give the word its commonly accepted meanings, among which are, "having a meaning" and "deserving to be considered." *Townsend v. Heckler*, 581 F. Supp. 157, 159 (W.D. Va. 1983). In *Townsend*, the court also noted that the antonym of "significant" is "meaningless." 581 F. Supp. at 159.

In evaluating the severity of mental impairments, the ALJ must first determine the degree of functional loss in four areas considered essential to the ability to work: (1) understanding, remembering or applying information; (2) interacting with others; (3) the ability to concentrate, persist or maintain pace; and (4) adapting or managing oneself. *See* 20 C.F.R. § 404.1520a(c)(3) (2018). These areas are rated on the following five-point scale: none, mild, moderate, marked and extreme. *See* 20 C.F.R. § 404.1520a(c)(4). The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. *See* 20 C.F.R. § 404.1520a(c)(4). If a claimant's degree of limitation in all of these areas is rated as "none" or "mild," the Commissioner generally will find that the claimant's impairment is not "severe" unless the evidence otherwise indicates that there is more than a minimal limitation in the ability to do basic work activities. *See* 20 C.F.R. § 404.1520a(d)(1). Here, the ALJ found that Cooper had "mild limitations" in all four areas. (R. at 18-20.)

The ALJ explained that the area of understanding, remembering and applying information refers to an individual's ability to learn, recall and use information to perform work activities. (R. at 18.) This category considers a claimant's ability to understand and learn terms, instructions and procedures, to follow one- to two-step oral instructions, to recognize a mistake and correct it, to identify and solve problems, to sequence multi-step activities and to use reason and

judgment to make work-related decisions. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00E.1 (2018).

The ALJ noted that the medical evidence showed no serious deficits in Cooper's memory, insight or judgment, and she was able to provide her full history to treating and examining practitioners. (R. at 18, 425, 462-63, 580.) Cooper reported that she performed normal necessary household activities, such as laundry, cooking and cleaning. (R. at 464.) Although Cooper stated, prior to quitting her job, she would "be driving to work and just forget where I was going," she did not complain of symptoms related to understanding and remembering after she quit her job in February 2014. (R. at 18, 580.)

In 2015 and 2016, Cooper was alert and cooperative with good mental status; her affect, thought content and general fund of knowledge were intact; she was able to recall four out of five words; she correctly performed Serial 7s; she gave high order and correct interpretation to three out of three commonly used adages; she correctly spelled the word "world" both forwards and backwards; she had intact recent and remote memory; she had coherent thought processes and good insight; her fund of knowledge, awareness of current events and past history was appropriate; her higher cognitive functions were intact; and she could perform simple calculations and understand proverbs. (R. at 424, 465, 593-94, 598-99.)

Cooper repeatedly related her symptoms of depression to her physical problems. (R. at 371-73, 413, 580.) Furthermore, Cooper reported on numerous occasions that medication relieved her pain and controlled her symptoms of depression and anxiety; therefore, she repeatedly denied symptoms of anxiety and depression. (R. at 377-79, 381-83, 410, 412, 486, 593, 598.) In addition, Dr. Kanwal repeatedly reported that Cooper's anxiety and depression were stable. (R.

at 370-72, 374-77, 379-82, 410-11, 413, 499, 589-90, 607.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). The ALJ, therefore, found that Cooper had mild limitations regarding her ability to understand, remember and apply information.

The ALJ explained that the area of interacting with others refers to a claimant's capacity to relate to and work with supervisors, co-workers and the public. (R. at 18.) *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00E.2. Examples of interacting with others include, cooperating with others, asking for help when needed, handling conflicts, stating own point of view, initiating or sustaining conversation, understanding and responding to social cues, responding to requests, suggestions, criticism, correction or challenges and keeping social interactions free of excessive irritability, sensitivity, argumentativeness or suspiciousness. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00E.2. Cooper reported that she had a "great" relationship with her husband and son and a "good" relationship with her mother. (R. at 571, 580.) She indicated that her family relationships were adequately supportive. (R. at 571.) While Cooper denied social support due to isolation within her own residence due to depressive symptoms, she indicated that psychiatric intervention was not a priority. (R. at 546, 573.) Cooper reported that she enjoyed "going out and getting her hair done," but that she was unable to do so due to lack of funds. (R. at 545.) Therefore, the ALJ found that Cooper had mild limitations in the category of interacting with others.

The ALJ explained that the area of ability to concentrate, persist or maintain pace concerns actions that demonstrate the ability to focus attention on work activities and stay on task at a sustained rate. (R. at 19.) *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00E.3. Examples include initiating and performing a work

-18-

task, working at an appropriate and consistent pace, completing tasks in a timely manner, ignoring distractions, changing activities without being disruptive, working close to or with others without interrupting or distracting them and sustaining an ordinary routine and regular attendance at work, as well as the ability to work a full day without needing more than the allotted number or length of rest periods customarily provided. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00E.3. The ALJ noted that Cooper voiced no significant complaints with problems in the area of concentration, persistence or pace to her medical care providers after her work-related stressor ended in February 2014. (R. at 19.) Cooper's affect, thought content and general fund of knowledge were intact. (R. at 424.) Dr. Blackwell noted that Cooper appeared reliable and reasonably consistent throughout the examination. (R. at 425.) None of Cooper's medical care providers voiced concerns related to this domain. Thus, the ALJ found that Cooper had mild limitations in her ability to concentrate, persist or maintain pace. (R. at 19.)

The ALJ explained that the area of adapting or managing oneself deals with a claimant's ability to regulate emotions, control behaviors and maintain well-being in a work setting. (R. at 19.) *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00E.4. This includes the ability to respond to demands, adapt to changes, manage psychologically based symptoms, distinguish between acceptable and unacceptable work performance, set realistic goals, make plans independently of others, maintain personal appearance and attire and to be aware of normal hazards and to take precautions. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00E.4. The ALJ noted that Cooper did report, but her medical care providers did not observe, any serious problems with adaptation or managing herself. (R. at 19.) The ALJ noted that there was no evidence that Cooper had serious problems being aware of normal hazards and taking appropriate precautions. (R. at 19.) Cooper was groomed, clean, alert and oriented, and she answered questions appropriately. (R.

at 431.) It was noted that Cooper had age-appropriate activities of daily living skills. (R. at 546.) Cooper reported performing housework, walking for exercise and performing floor exercises. (R. at 432.) Thus, the ALJ found that Cooper had mild limitations in her ability to adapt or manage herself. (R. at 19.)

Cooper contends that her treatment with medication and counseling for her complaints of depression and anxiety warrants a finding of a severe mental impairment. (Plaintiff's Brief at 6.) The fact that a claimant received treatment is not sufficient to show a "severe impairment." *See Walker v. Comm'r of Soc. Sec.*, 61 F. App'x 787, 789 (3d Cir. 2003) (stating "the fact that he was on medication simply indicate[s] that he did have some depression, but do[es] not conflict with the ALJ's finding[] that the depression was not severe"). In fact, a mere diagnosis does not make an impairment "severe." *See Synder v. Berryhill*, 2017 WL 2273157, at *2 (W.D.N.C. May 24, 2017) (citing *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of [an impairment], of course, says nothing about the severity of the condition.")); *see also Hall v. Colvin*, 2014 WL 988750, at *7 (W.D. Va. Mar. 13, 2014) (a "diagnosis alone is not evidence of a severe impairment").

Cooper also argues the ALJ erred by not relying on the opinions of Lanthorn and Drs. Kanwal and Blackwell in determining her residual functional capacity. (Plaintiff's Brief at 6-8.) The ALJ found that Cooper had the residual functional capacity to perform light work that required no more than occasional climbing of ladders, ropes or scaffolds and that required no more than occasional exposure to unprotected heights, moving mechanical parts and vibration. (R. at 20-21.)

Cooper argues that the ALJ erred by assigning "little weight" to the opinions of Dr. Kanwal, Dr. Blackwell and Lanthorn. (Plaintiff's Brief at 6-8.)

Based on my review of the record, I find this argument unpersuasive. The ALJ gave "significant weight" to the opinions of the state agency physicians who opined that Cooper had the residual functional capacity to perform a limited range of light work. (R. at 25, 108-09, 122-23.) While the ALJ, in general, is required to give more weight to opinion evidence from examining versus nonexamining medical sources, the ALJ is not required to give controlling weight to the opinions of a consultative examiner. *See* 20 C.F.R. § 416.927(c) (2018). In fact, even an opinion from a treating physician will be accorded significantly less weight if it is "not supported by clinical evidence or if it is inconsistent with other substantial evidence…." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). Furthermore, the ALJ is entitled to rely on a nonexamining source's medical opinion where that opinion is supported by the record as a whole. *See Alla Z. v. Berryhill*, 2018 WL 4704060, at *11 (W.D. Va. Sept. 30, 2018); *see also* 20 C.F.R. § 404.1527(c)(3) (2018).

The ALJ stated that he was giving "little weight" to Dr. Kanwal's August 13, 2014, mental assessment because the record and Cooper's own testimony indicated less severe limitations. (R. at 26, 362-64.) Dr. Kanwal opined that Cooper had a satisfactory to seriously limited ability to make occupational, performance and personal adjustments. (R. at 362-64.) Dr. Kanwal did not identify any specific medical or clinical findings to support these limitations. (R. at 363-64.) In considering and evaluating Cooper's complaints, Dr. Kanwal did not increase her medications, as he repeatedly reported that Cooper's symptoms of depression and anxiety were stable on medication. (R. at 371-83, 410, 499, 588-90, 607, 616.) Cooper repeatedly related her symptoms of depression to her physical problems. (R. at 371-73, 413, 580.) Furthermore, Cooper reported on numerous occasions that medication relieved her pain and controlled her symptoms of

depression and anxiety; therefore, she repeatedly denied symptoms of anxiety and depression. (R. at 377-79, 381-83, 410, 412, 486, 593, 598.)

The ALJ stated that he was giving "little weight" to Dr. Kanwal's physical assessments dated August 13, 2014, and December 1, 2016, and his November 2, 2016, opinion, because the record indicated less severe limitations. (R. at 26-27, 366-68, 532.) The ALJ noted that the objective evidence did not support Cooper's allegations of severe pain and limited mobility. (R. at 28.) Two of Dr. Kanwal's opinions were check-box forms. (R. at 366-68, 534-36.) I first note that such check-box forms are not entitled to great weight. *See Gerette v. Colvin*, 2016 WL 1296082, at *6 (W.D. Va. Mar. 30, 2016) (form reports, in which a physician's only obligation is to check a box or fill in a blank, are entitled to little weight in the adjudication process); *Walker v. Colvin*, 2015 WL 5138281, at *8 (W.D. Va. Aug. 31, 2015) (checkbox forms are of limited probative value); *Ferdinand v. Astrue*, 2013 WL 1333540, at *10 n.3 (E.D. Va. Feb. 28, 2013) (check-the-box forms are weak evidence at best); *Leonard v. Astrue*, 2012 WL 4404508, at *4 (W.D. Va. Sept. 25, 2012) (check-the-box assessments without explanatory comments are not entitled to great weight, even when completed by a treating physician).

The objective evidence does not show evidence of a physical impairment to support Dr. Kanwal's limitations. In 2012, an MRI of Cooper's lumbar spine showed a small broad-based disc protrusion at the L5-S1 disc level with no neural compromise. (R. at 321.) In 2013, x-rays of Cooper's hand were normal. (R. at 360.) In 2015, x-rays of Cooper's lumbar spine were normal. (R. at 418.) In completing his December 2016 assessment regarding Cooper's standing, walking and sitting limitations, Dr. Kanwal cited Cooper's subjective complaints, such as "in pain and agony" and "in pain all the time." (R. at 534-35.) *See Craig*, 76 F.3d at 590, n.2 ("There is nothing objective about a doctor saying, without more, 'I

observed my patient telling me she was in pain.'") Cooper repeatedly reported that her pain was relieved with medication. (R. at 370, 379, 382, 412, 593, 598.) *See Gross,* 785 F.2d at 1166.

The ALJ stated that he was giving "little weight" to Dr. Blackwell's opinion because the objective medical evidence did not support it. (R. at 27.) On examination, Dr. Blackwell observed that, although Cooper was tender to her low back and knees, her gait was symmetrical and balanced. (R. at 425.) The remainder of his musculoskeletal examination was completely normal; Cooper's upper and lower joints were with no effusions or obvious deformities; her grip strength was good at a full 5/5 and equal bilaterally; her fine motor movement and skill activities of her hands was normal; her reflexes in the upper and lower extremities was good and equal bilaterally; and she had intact sensation. (R. at 425.) In addition, the entirety of Dr. Blackwell's range of motion form also was within normal limits. (R. at 422.) Dr. Blackwell's assessment failed to match his own benign physical examination findings, as well as the objective medical evidence. *See* 20 C.F.R. §§ 404.1527(c)(3)-(4) (the more the opinion is consistent with the record and supported by an explanation, the more weight we will give to that opinion).

The ALJ stated that he was giving "little weight" to Lanthorn's opinion because it was inconsistent with the other objective medical evidence. (R. at 27.) *See* 20 C.F.R. §§ 404.1527(c)(3)-(4); *see also Gross*, 785 F.2d at 1166. The ALJ noted that Cooper's ability to graduate from high school and serve as a district manager for nine retail stores for many years made Lanthorn's "borderline intellectual functioning" diagnosis "suspect." (R. at 27, 44, 47, 467.) The ALJ also noted that Cooper had been on several medications for her depression and anxiety, which reduced and controlled her symptoms. (R. at 27, 371-83, 410, 499, 588-90,

607, 616.) Although Cooper was sometimes noted as anxious, treatment notes show that she did not have difficulty in logic and concentration, and her thinking was clear and rational. (R. at 27, 465, 594, 599, 609.) Furthermore, Cooper did not have any inpatient hospitalizations or suicide attempts or ideation. (R. at 27, 546, 572-73.)

The ALJ further stated that he was giving "significant weight" to the assessment of state agency physicians who opined that Cooper was capable of performing light work. (R. at 25, 108-09, 122-23.) The ALJ noted that these opinions were consistent with the objective evidence of record. *See Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986) (Fourth Circuit cases "clearly contemplate the possibility that [treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians").

Based on the above, I find that the ALJ properly weighed the evidence and that substantial evidence exists to support the ALJ's finding that Cooper did not suffer from a severe mental impairment. I also find that substantial evidence exists to support the ALJ's finding regarding Cooper's residual functional capacity.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists in the record to support the ALJ's finding that Cooper did not suffer from a severe mental impairment;

2.  Substantial evidence exists in the record to support the ALJ's weighing of the medical evidence;

3. Substantial evidence exists to support the ALJ's finding regarding Cooper's physical residual functional capacity; and

4. Substantial evidence exists in the record to support the Commissioner's finding that Cooper was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Cooper's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2018):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion

of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time at this time.

DATED:    October 29, 2019.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE